Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Richard R. Barker
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN EDWARD MCGINNIS,<br><br>Defendant. | Case No.: 2:20-CR-00091-RMP-1<br><br>United States' Sentencing Memorandum |

Plaintiff, United States of America, by and through United States Attorney Vanessa R. Waldref and Assistant United States Attorney Richard R. Barker, submits the following sentencing memorandum. For the reasons set forth herein, the United States respectfully seeks of a period of incarceration of three hundred months, followed by a three-year term of supervised release.

### STATEMENT OF FACTS

On or about June 1, 2020, Defendant arrived at the home of L.C. When Defendant arrived, L.C.'s two grandchildren Minor 1 (age 13) and Minor 2 (age 9) were also at the home. ECF No. 55 at ¶ 11-12. Shortly after he got there, Defendant left for a walk. *Id.* at ¶11. When Defendant returned, he was acting strangely and seemed agitated. *Id.* Defendant then accused Minor 1 of being a "snitch" and grabbed the child's cellular telephone and shattered it. *Id.* Defendant then pulled out a .22 revolver and demanded that Minor 1 and Minor 2 shoot him. *Id.* at ¶16. When they

United States Sentencing Memorandum - 1

refused, Defendant began firing the gun in the residence, repeatedly discharging the gun, firing shots into a bedroom and a hallway. *See id.* Defendant shot at the walls, the ceiling, a lit candle, and the running air conditioner. *Id.* at ¶12. Even after the gunshots, Defendant refused to allow L.C. to turn off the air conditioner, and it subsequently caught fire. *Id.* Defendant then directed his focus to L.C. *See id.* at ¶ 13. He demanded the keys to her truck. *Id.* at ¶11. When she refused, Defendant punched a hole in the wall. *Id.* L.C. feared that because of Defendant's irrational behavior and the firearm in his possession, he may kill her and her grandchildren. *See id.*

Defendant then forced L.C. and her two grandchildren into a room and did not permit them to leave that room for approximately 30 minutes. *Id.* at ¶12. While there, Defendant continued to discharge the firearm. *Id.* Once Defendant finally permitted L.C. and the children to leave the room, he forced them, at gunpoint, into L.C.'s black Toyota Tacoma. *Id.* at ¶13. Inside the vehicle, Defendant demanded everyone to act like a happy family, and he instructed L.C. to drive to a trailer parked on Owhi Lake Loop Road, where Defendant had been staying. *Id.*

When they got to the trailer, Defendant got out of the truck and went inside. Defendant then lit the curtains on fire as L.C. and the children looked on. *Id.* The trailer was a total loss – burned until only the frame was left. *Id.* After the trailer was destroyed, Defendant got back into the vehicle and demanded L.C. to drive in the direction of Coulee Dam, Washington. *Id.* at ¶14. While driving, Defendant continued to shoot the .22 caliber revolver – firing out the window. *Id.* Defendant would waive the gun around, threating L.C. and her two grandchildren and yelling at them to "shut up" before firing out the window again. *Id.* At one point, Defendant put the firearm in his mouth and demanded that Minor 2 (age 9 at the time) pull the trigger. *Id.* at ¶ 16. Even after Defendant ran out of ammunition, he continued to fire the gun which resulted in a clicking sound each time. *Id.* at ¶ 14. Minor 1 estimated that Defendant fired 6 shots at the home and 9 additional shots while in the truck on

United States Sentencing Memorandum - 2

the way to Grand Coulee. *Id.* Minor 1 also saw Defendant reload the firearm at one point. *Id.*

Eventually L.C. was able to convince Defendant to let her and the grandchildren out because they needed to go to the bathroom. *Id.* at 15. Defendant stopped at the Coulee medical center at a little after 10:00 p.m. *See id.* After escaping from Defendant, L.C. was then able to contact police. *Id.* Before police arrived, however, Defendant drove away in L.C.'s pickup truck without her permission. *Id.* Though L.C. and her grandchildren were able to escape, Defendant's crime spree continued after L.C. and the children went into the hospital. *See id.* at ¶¶15, 22.

After leaving L.C. and her grandchildren at the Coulee Medical Center, Defendant drove to the home of Minor 3 (then age 17) in Grand Coulee, Washington. Defendant arrived sometime a little after 10:00 p.m. *Id.* at ¶ 22. Minor 3 heard a loud knock on the backdoor, and assuming it was her boyfriend, she started unlocking it. *Id.* Before undoing the deadbolt, she looked through the peephole and realized it was not her boyfriend – though she did not immediately recognize the man on the other side of the door. *Id.* There was another loud bang and the man yelled "If you don't open this door, I'm going to kick it down!" *Id.* Fearing for her life, Minor 3 ran to her bedroom and hid in the closet. *Id.* at ¶ 23. She then tried unsuccessfully to contact her boyfriend from her computer. *Id.*

Defendant came into the room and found Minor 3 hiding in the closet. *Id.* at ¶ 24. He grabbed her by the hair and demanded to know where her boyfriend was. *Id.* When Minor 3 responded that she did not know, Defendant put a firearm to her head and stated, "Come on you're going with me." *Id.* Minor 3 did not immediately move, so Defendant grabbed her by her hair and dragged her out of the closet. *Id.* Defendant went down the hall to an older female's room and demanded the female's phone and tablet. Minor 3 was behind Defendant with the firearm still pointed at her so that the older female was not able to see the gun. *Id.* Defendant then directed Minor 3 out of the apartment. *Id.* While walking from the apartment to the stolen

United States Sentencing Memorandum - 3

truck Defendant was driving, Minor 3 saw two individuals. Although Minor 3 tried to communicate that she was being kidnapped, the Defendant ordered her into the passenger side of the car at gunpoint. *Id.* at 25.

Defendant sped off from the apartment. Minor 3 asked Defendant why he was doing this, to which he responded, "If you don't shut up, I'm going to do something to you. I have three bodies in here already." *Id.* at ¶ 26. Minor 3 kept pleading to be released, but Defendant would just scream, "Shut up!" *Id.* Minor 3 did whatever she could to keep Defendant to keep him calm and try to gain his trust. *Id.* At one point, Defendant pulled over, put the firearm in his mouth and asked Minor 3 to pull the trigger. *Id.* at ¶ 27. She refused. Around this time, a car drove by, and Defendant got back on the main road. *Id.*

Defendant pulled off on to another side road and instructed Minor 3 to grab his leg and rub his penis. *Id.* at ¶ 28. When she resisted, he pulled the hammer back on the firearm and gave her the same instruction. Fearing for her life, she complied. *Id.* Even though she did not want to touch Defendant, Minor 3 also kissed Defendant when he stated, "you will see what happens if you don't." *Id.*

Defendant and Minor 3 stopped at a gas station in Spokane, Washington around 1:42 a.m. *Id.* at ¶30. Minor 3 assured Defendant that she would return after going inside to pay for the gas. Defendant let her go inside, after threatening that he would come into the store and shoot her if she did not return to the truck. *Id.* Defendant also threatened to kill Minor 3's loved ones if she tried to escape. *Id.* Once inside, Minor 3 notified the clerk to call the police and immediately locked herself in the bathroom. *Id.* at ¶31. Minor 3 explained that she hid because she was terrified Defendant would come in, kill the clerk, and then find her. *Id.* Minor 3 stayed locked in the bathroom until police arrived. *Id.*

Even after Minor 3 escaped, Defendant's crime spree was not over. Police observed the stolen truck driving on Second Avenue in Spokane. *Id.* at ¶34. When they tried to pull the truck over, Defendant led them on a high-speed chase that

United States Sentencing Memorandum - 4

concluded after Defendant decided to drive off road. *Id.* at ¶34. When he left the roadway, Defendant high-centered the truck on uneven terrain. *Id.* Police soon apprehended him. *Id.* The .22 revolver Defendant used to perpetrate his crimes was found inside the truck. *Id.* at ¶38.

## VICTIM IMPACT

L.C. and her grandchildren spent their Monday evening in the presence of a man with a gun, who fired multiple shots, and forced them from their home at gun point. L.C. and her grandchildren feared for their lives, not knowing how much ammunition Defendant had or whether Defendant would follow through on one of his many threats. This trauma did not stop at 10:18 p.m. when they escaped Defendant. This trauma and the events of that evening will continue to be a part of their lives.

From around 10:18 p.m. till 1:42 a.m., Minor 3 was alone with a man she did not know very well, with a gun to her head, not knowing if she would survive. She was abducted from the safety of her home and driven on dark back roads for hours. Minor 3 is lucky to have escaped, but she will forever remember the events of that evening—including the sexual assault Defendant perpetrated against her.

## SENTENCING CALCULATIONS

The government agrees with United States Probation that Defendant's total offense level is 39, criminal history category is IV, and the guideline range is 360 to life. ECF No. 55 at ¶172.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In determining the appropriate sentence, this Court should consider the factors as set forth in 18 U.S.C. § 3553(a).

1. <u>The nature and circumstances of the offense</u>

The circumstances of the offenses involve Defendant's kidnapping of four people, destruction of property, and use of a firearm. The kidnapping of L.C. and her two grandchildren was a horrifying experience in which they all feared for their lives.

ECF No. 55 at ¶11. Defendant came to L.C.'s home, unannounced, acting strangely, and then started shooting at walls, ceilings, and the air conditioner, which subsequently caught fire. *Id* at ¶12. After forcing the victims into L.C.'s pickup truck, he forced them to watch him burn down a trailer. *Id* at ¶13. Then back in the car, Defendant put the firearm in his mouth and asked the victims present, including a 9-year-old, to pull the trigger. *Id* at ¶16. Based on Defendant's behavior, it is shocking that L.C. and her grandchildren were not physically injured. Yet, while they may not have physical injuries, this incident will impact them for the rest of their lives.

The kidnapping of Minor 3 is just as harrowing as that of L.C. and her grandchildren – perhaps even more so. Minor 3 is 17 and was taken at gun point from her home at 10 p.m. ECF 55 at ¶ 22. While in the car with Defendant, he told her he already had killed three other people. *Id* at ¶ 26. As Defendant had done in the previous kidnapping, he put the gun in his mouth and instructed Minor 3 to pull the trigger. *Id* at ¶ 27. After pulling onto a dirt side road, Defendant pulled over and forced Minor 3 to rub his penis. When she refused, Defendant pulled back the hammer of the gun and held it to her head. *Id* at ¶ 28. While driving, Defendant threatened to murder Minor 3 and her loved ones if she tried to escape. *Id* at ¶30. Minor 3 was finally able to escape by locking herself in a gas station bathroom while the clerk called the police. *Id* at ¶ 31. Minor 3 endured a horrific experience that will alter her life. Being kidnapped from your home and violated while threatened with death, will forever be an experience that affects her.

2.  History and Characteristics of Defendant

Defendant's criminal history is concerning. He was first arrested at age 12 in 1999 for theft. ECF No. 55 at ¶78. From that year on, Defendant was in and out of custody for various charges. In 2009, at the age of 22, Defendant was charged and sentenced for an assault with a dangerous weapon *Id* at ¶108. Defendant was also charged in 2009 with first degree reckless firing of a weapon. *Id* at 119. Defendant's

charges related to substance abuse also started as a minor. He had various charges for alcohol and drugs from an early age. *Id* at ¶78.

Defendant's criminal history demonstrates that he has engaged in several violent offenses, as well as a history of drug and alcohol abuse. Based on the length of the criminal record, it is clear that the prior stints of incarceration have had no impact on Defendant's behavior. This history demonstrates that Defendant poses a danger to the community and incarceration is warranted in this case. Additionally, Defendant was on supervised release when he committed the offenses to which he has now pled guilty. Defendant's crimes have escalated. He is a grave risk to the community, even when supervised. A lengthy sentence is absolutely necessary to protect the public.

> 3.  <u>The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and protect the public.</u>

The United States asks the Court to sentence the Defendant to 300 months, the maximum penalty allowed under the 11(c)(1)(C) plea agreement to be followed by five years of supervised release. In his prior cases, Defendant has been incarcerated for significant periods of time. For instance, in 2006, Defendant was sentenced to 53 months' custody for Second Degree Burglary. ECF No. 55 at ¶100. In 2011, Defendant was convicted in federal district court of Assault with a Dangerous Weapon and sentenced to 120 months' custody in connection with a drive by shooting. *Id.* at ¶108. Notwithstanding these lengthy sentences, Defendant is undeterred. He has continued to threaten and assault others despite his previous convictions and penalties for such behavior and despite being on supervised release. At this point, it is clear that a lengthy sentence is necessary – not necessarily as punishment – but to keep the community safe.

///

///

United States Sentencing Memorandum - 7

### 4. The need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct.

The best way to ensure consistent sentences for similarly-situated Defendants across courtrooms, districts, and the country is for courts to apply the sentencing Guidelines in the same manner everywhere. *See United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). The Guidelines are the only normative way to accomplish that. In this case, a Guidelines sentence of twenty-seven months properly accounts for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Numerous courts have recognized that sentencing within the Guidelines range serves as a bulwark against unwarranted sentencing disparity. *See United States v. Guerrero-Velasquez*, 434 F.3d 1193, 1195 n.1 (9th Cir. 2006) (recognizing that guidelines "help to maintain uniformity in sentencing throughout the country"); *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006) ("The Guidelines . . . are an indispensable tool in helping courts achieve Congress's mandate to consider 'the need to avoid unwarranted sentence disparities' among similarly situated defendants") (quoting 18 U.S.C. § 3553(a)(6)); *United States v. Smith*, 445 F.3d 1, 7 (1st Cir. 2006) (noting that "the guideline range . . . is the principal means of complying with" the goal of avoiding unwarranted sentencing disparity).

The Ninth Circuit has specifically observed that a sentence consistent with the guideline range is unlikely to be disparate because such a sentence "represents the sentence that most similarly situated defendants are likely to receive." *United States v. Becerril-Lopez*, 541 F.3d 881, 895 (9th Cir. 2008). Thus, mindful that the Guidelines must be "the starting point and the initial benchmark," *United States v. Carty,* 520 F.3d 984, 991–92 (9th Cir. 2008), the United States submits that a sentence of 300 months, which is slightly below the guidelines, will avoid

United States Sentencing Memorandum - 8

unwarranted sentencing disparity and is appropriate in this case. A sentence of anything less, especially on these facts, would be disproportionately low considering Defendant's history and the harm inflicted on his four victims in this case, including three minor children.

## GOVERNMENT'S SENTENCING RECOMMENDATION

The government recommends the Court impose a sentence of three hundred--months imprisonment and a five-year term of supervised release. Although this is lengthy sentence, it actually is below the guidelines range, as determined by probation. In short, a sentence of three-hundred months' imprisonment and five years of supervised release is the appropriate, taking into consideration of all the relevant factors under 3553(a).

Respectfully submitted on August 2, 2022.

                Vanessa R. Waldref
                United States Attorney

                *s/ Richard R. Barker*
                Richard R. Barker
                Assistant United States Attorney

## CERTIFICATION

I hereby certify that on August 2, 2022, I electronically filed the foregoing with the Clerk of the Court and counsel of record using the CM/ECF System.

*s/Richard R. Barker*
Richard R. Barker
Assistant United States Attorney